The MURRAY CORPORATION OF
AMERICA, a Delaware corpora-
tion, Plaintiff,

v.

CITY OF DETROIT, a Michigan Munici-
pal corporation,
and
County of Wayne, a Michigan Constitu-
tional Body Corporate, Defendants,
The United States of America,
Intervenor.

Civ. A. No. 12108.

United States District Court
E. D. Michigan, S. D.

June 23, 1955.

Butzel, Eaman, Long, Gust & Ken-
nedy, Detroit, Mich., Victor W. Klein,
James D. Ritchie, William M. Saxton,
Detroit, Mich., of counsel, for plaintiff.

Paul T. Dwyer, Corp. Counsel, Detroit,
Mich., Bert R. Sogge, Julius C. Pliskow,
Asst. Corp. Counsel, Detroit, Mich., for
the City of Detroit.

Gerald K. O'Brien, Pros. Atty., Detroit,
Mich., Hobart Taylor, Jr., Aloysius J.
Suchy, Asst. Prosecuting Attys., Detroit,
Mich., for the County of Wayne.

H. Brian Holland, Asst. Atty. Gen.,
Andrew D. Sharpe, Lyle M. Turner, Er-
win A. Goldstein, Sp. Assts. to the
Atty. Gen., Frederick W. Kaess, U. S.
Atty., John L. Owen, Asst. U. S. Atty.,
Detroit, Mich., for the United States.

THORNTON, District Judge.

The Murray Corporation, plaintiff herein, brings this action to recover ad valorem personal property taxes assessed by the City of Detroit, County of Wayne, upon personal property in the possession of the Murray Corporation, said taxes having been paid by the plaintiff under protest. The amount assessed by the City was $67,714.96, and that by the County was $12,572.66. The United States of America was permitted to intervene because of the fact that it claimed ownership of the personal property on which the assessments were made. The personal property so taxed was in the possession of the plaintiff under letter subcontracts, under prime letter contracts, for the manufacture of parts and components for aircraft for the United States Air Force for defense purposes.

The plaintiff has moved for summary judgment in its favor, and at the hearing of this motion it was agreed among the parties that there was no genuine issue of any material fact, and that a summary judgment in favor of the plaintiff, or in favor of the defendants would be in order.

The Court is not unmindful of the effects of its decision in this matter. The Court has been advised that there are many actions in this geographical area that have been commenced, or are about to be commenced, involving the issue which we are here called upon to resolve, and that the aggregate of taxes involved may well be in the neighborhood of two million dollars.

The parties to this suit have presented oral arguments followed by the submission of successive briefs totaling seven in number. As previously stated, the factual picture here presented is undisputed —not so, however, as to its legal significance. The plaintiff is a letter subcontractor of the Kaiser Manufacturing Corporation to which a letter prime contract between the United States Government and the Kaiser-Fraser Corporation was assigned by mutual consent. The letter subcontract between the Kaiser Manufacturing Corporation and the plaintiff covered the manufacture of specified parts and assemblies required under the prime contract for the United States Air Force for national defense. This letter subcontract and its amendments were approved by a Contracting Officer of the United States Air Force in accordance with the requirements of the letter prime contract. Included in the letter subcontract, by amendment, was the Partial Payment Clause which is the nub of this controversy. The following is the text of said clause:

"11. Partial payments—Partial payments, which are hereby defined as payments prior to delivery, on work in progress for the Government under this contract, may be made upon the following terms and conditions.

"(a) The Contracting Officer may, from time to time authorize partial payments to The Murray Corporation of America (hereinafter called 'the Contractor') upon property acquired or produced by it for the performance of this contract: *Provided,* that such partial payments shall not exceed 90 percent of the cost to the Contractor of the property upon which payment is made, which cost shall be determined from evidence submitted by the Contractor and which must be such as is satisfactory to the Contracting Officer; *Provided further,* that in no event shall the total of unliquidated partial payments (see (c) below) and of unliquidated partial payments, if any, made under this contract, exceed 80 percent of the contract price of supplies still to be delivered.

"(b) Upon the making of any partial payment under this contract, title to all parts, materials, inventories, work in process and nondurable tools theretofore acquired or produced by the Contractor for the performance of this contract, and properly chargeable thereto under sound accounting practice, shall

forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor for the performance of this contract and properly chargeable thereto as aforesaid shall vest in the Government forthwith upon said acquisition or production: *Provided*, that nothing herein shall deprive the Contractor of any further partial or final payments due or to become due hereunder; or relieve the Contractor, Kaiser-Fraser Corporation, or the Government of any of their respective rights or obligations under this contract.

"(c) In making payment for the supplies furnished hereunder, there shall be deducted from the contract price therefor a proportionate amount of the partial payments theretofore made to the Contractor, under the authority herein contained.

"(d) It is recognized that property (including, without limitation, completed supplies, spare parts, drawings, information, partially completed supplies, work in process, materials, fabricated parts and other things called for herein) title to which is or may hereafter become vested in the Government pursuant to this Article will from time to time be used by or put in the care, custody or possession of the Contractor in connection with the performance of this contract. The Contractor, either before or after receipt of notice of termination at the option of the Government, may acquire or dispose of property to which title is vested in the Government under this Article, upon terms approved by the Contracting Officer, provided, that, after receipt of notice of termination, any such property that is a part of termination inventory may be acquired or disposed of only in accordance with the provisions of the termination article of this contract and applicable laws and regulations. The agreed price (in case of acquisition by the contractor) or the proceeds received by the Contractor (in case of any other disposition), shall, to the extent that such price and proceeds do not exceed the unliquidated balance of partial payments hereunder, be paid or credited to the Government as the Contracting Officer shall direct; and such unliquidated balance shall be reduced accordingly. Current production scrap may be sold by the Contractor without approval of the Contracting Officer but the proceeds will be applied as provided in this paragraph (d), provided that any such scrap which is a part of termination inventory may be sold only in accordance with the provisions of the termination article of this contract and applicable laws and regulations. Upon liquidation of all partial payments hereunder or upon completion of deliveries called for by this contract, title to all property (or the proceeds thereof) which has not been delivered to and accepted by the Government under this contract or which has not been incorporated in supplies delivered to and accepted by the Government under this contract and to which title has vested in the Government under this Article shall vest in the Contractor.

"(e) The article of this contract captioned 'Liability for Government-furnished Property' and any other provision of this contract defining liability for Government-furnished property shall be inapplicable to property to which the Government shall have acquired title solely by virtue of the provisions of this Article. The provisions of this Article shall not relieve the Contractor from risk of loss or destruction of or damage to property to which title vests in the Government under the provisions hereof.

"(f) If this contract (as heretofore or hereafter supplemented or amended) contains provision for Ad-

vance Payments, and in addition if at the time any partial payment is to be made to the Contractor under the provisions of this partial payments article any unliquidated balance of advance payments is outstanding, then notwithstanding any other provision of the Advance Payments Article of this contract the net amount, after appropriate deduction for liquidation of the advance payment, of such partial payment shall be deposited in the special bank account or accounts maintained as required by the provisions of the Advance Payments Article, and shall thereafter be withdrawn only pursuant to such provisions."

The plaintiff herein was a letter subcontractor also of the Wright Aeronautical Corporation, later merged with Curtiss-Wright Corporation, and the same situation prevailed in its relationship to Curtiss-Wright as did with respect to its relationship to the Kaiser Manufacturing Corporation insofar as pertains to the issues with which we are here concerned—the terms of the Partial Payment Clause and approval of their inclusion in the letter subcontracts by the Contracting Officer of the United States Air Force.

The assessment date here in question was January 1, 1952. During the calendar year 1951 the plaintiff made formal written requests at various intervals, and in varying amounts for payments to it by its two contractors— Kaiser Manufacturing Corporation and Curtiss-Wright Corporation—in accordance with the Partial Payment Clauses contained in the respective letter subcontracts. Said requests were audited and approved by a Contracting Officer of the United States Air Force. On October 12, 1951, partial payment in the amount of $163,949.20, representing the aggregate amount of the requests, was made by the Kaiser Manufacturing Corporation to plaintiff, and on December 31, 1951, a payment of $510,827.67 was similarly made by Curtiss-Wright to plaintiff.

The position of the plaintiff is that it has paid taxes which were unlawfully assessed to it, and that the assessment is illegal and void. Plaintiff contends:

I.   The tax assessed is an ad valorem tax assessed upon the property and not a privilege tax assessed against the taxpayer.

II.   Property owned by the Federal Government is immune from local ad valorem property tax.

III.   The question of title under procurement contracts entered into pursuant to Federal procurement statutes and constitutional authority presents a Federal question for determination by Federal courts under Federal law exclusively, and is in nowise subject to, or controlled by the law of any state.

IV.   Partial payment clauses vesting title in the Federal Government were fully authorized and effective.

V.   Under the partial payment clauses title to the property here in question was vested in the United States Government on assessment day, January 1, 1952. This was absolute title—not bare lien or security title.

VI.   Equitable arguments advanced by defendants, City of Detroit and County of Wayne, have been fully and completely rejected by the Supreme Court of the United States.

VII.   Murray is the real party in interest and the proper party to bring this action.

VIII.   There is nothing in the conduct of the parties inconsistent with the vesting of absolute title, or which could divest the United States Government of such title.

IX.   The taxes were not paid voluntarily, but under protest.

The United States contends that the assessment was based on property of the United States and was constitutionally invalid. It reasons that the ownership of the property was vested in the United States when the assessment was made, said ownership having vested at the time of the making of partial payments in accordance with the Partial

Payment Clause, which was fully authorized. It also devotes some of its argument to the proposition that the Murray Corporation is the real party in interest.

In direct opposition to the contentions of the plaintiff and to those of the United States, the position of the City of Detroit is that:

I. The partial payment and transfer of title clause was not authorized, nor was it in conformance with the Federal statutes.

II. The inclusion of the above clause would not defeat an ad valorem tax on personal property in the hands of an independent subcontractor acquired in the course of carrying out provisions of a subcontract for defense production.

III. The course of action and dealing with the property was inconsistent with the vesting of absolute title; the Government, therefore, was given only a lien or title for security purposes, leaving plaintiff with an equitable title in said personal property which was still subject to an ad valorem property tax.

The position of the County of Wayne is aligned with that of the City of Detroit. It contends that the Murray Corporation is not the real party in interest. It also contends that the Contracting Officer had no authority to authorize the prime contractor to include the Partial Payment Clause or to include the provision for the passage of title from the subcontractor to the Government in the contracts between the prime and the subcontractors. Both the City and the County stand firm in their conviction as to the validity of the tax in question.

■ It is the County of Wayne which urges so strongly the proposition that plaintiff here is in noncompliance with Rule 17(a) Fed.Rules Civ.Proc. 28 U.S.C.A. The City fails to raise this point, which may or may not be significant. In any event the theory of the County is that the plaintiff has recovered the major portion of the taxes paid by passing it on to the prime contractor, and that plaintiff therefore has sustained no loss and, as a result, has no right to bring this action. The theory of the plaintiff is that the person having the right sought to be enforced, by substantive law, is the real party in interest, and that it is the law of the State which determines what is the substantive law. Under Michigan law, Comp.Laws 1948, § 211.53, M.S.A. 7.97, it is the person paying a tax such as this who may sue for refund. There is no claim made by the County that the plaintiff assigned its claim for the tax refund. It merely claims that because the amount of such tax was included as an item of plaintiff's cost in billing the prime contractor that plaintiff has deprived itself of the right to sue for refund. The cases to this effect cited by the County are inapposite. The Court is constrained to conclude that the argument of the County on this issue is specious.

■ The next point for discussion has to do with the validity of the inclusion of the Partial Payment Clause in the letter subcontracts. Both County and City contend that the authority for such procedure was lacking. Before making any comment upon the merit of this point, it occurs to the Court that there is some doubt concerning the propriety of a collateral attack by a city and a county upon the validity of a provision in a contract existing between parties to such contract when neither city nor county is itself party to said contract, and when the overall picture is as it is here. Such an issue may well be one that this Court should decline to resolve. None of the parties to the prime contract, or to the subcontract, contests the authority of the United States to include the Partial Payment Clause. It may well be that such authority might be properly questioned in a direct proceeding by the proper parties. Be that as it may, we are persuaded that the Partial Payment Clause herein is not invalid for want of authority, or for nonconformance with Federal statutes.

The point at issue most strongly debated, and having the greatest merit, is the effect of the Partial Payment Clause.

There is no disagreement on the proposition that local government may not tax property owned by the Federal Government. Whether the personal property here assessed was owned by the Federal Government in the sense that it could not be taxed at a local level is the issue. A reading of the Partial Payment Clause leaves no doubt that, upon the making of a partial payment, title to parts, materials, etc., acquired for the performance of the contract vests in the United States Government as does title to all property subsequently acquired for the performance of the contract.

It is the position of the City of Detroit that the transfer of title upon the making of partial payment is effective to create a lien, that the title of the United States to the property in question is security title only, and that plaintiff still remains the beneficial owner. The City cites numerous cases which it claims support this contention. In many, analogy is drawn to an equitable mortgage situation where, although title be transferred, said title is merely for security purposes, and is treated by the Courts as such. The City cites S.R.A., Inc., v. State of Minnesota, 1945, 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851, as authority for the proposition that despite the transfer of legal title here, the plaintiff still retained beneficial interest subject to taxation by the state. It is not perceived that the holding in this case supports the City's position. If the reasoning there used and quoted in the brief of the City be applied here, the argument of the City must fail. In that case the United States had contracted to sell land. The State sought to tax the realty at a time when the United States still held legal title. The Court held that it might do so—that the contract for the purchase of the land transferred the equity to the vendee and that the vendor, United States, retained only a legal title as security. The Court also went on to state that the "possibility of repossession by the United States is not enough to block a tax sale in which the paramount rights of the United States are protected." S.R.

A., Inc., v. State of Minnesota, supra, 327 U.S. 566, 66 S.Ct. at page 754. In the instant case the United States is the vendee of the assessed property. It has contracted with the prime contractor for the manufacture of aircraft subassemblies for delivery to it, for use by it, to be paid for by it, and to be fully and completely owned by it in every sense of the word ownership. It is submitted that title held for security purposes is a title that is intended to be relinquished, and whose forward look is transfer to a vendee, or retransfer to a mortgagor. Such title is temporary in nature, and it is so regarded by the parties. The City offers numerous arguments—all very creditable and well-presented—to the effect that, although bare legal title passed to the United States, the equitable title remained in the plaintiff. The brief of the City devotes some time to a so-called "course of conduct and dealing with the property in question inconsistent with the claim of absolute title in the Government." In its printed brief, at page 50, the City lists ten "salient facts" as illustrative of the inconsistent course of conduct. In view of the type of subcontract here involved, the scope of the operation, the practical exigencies existent, these ten "salient facts" are not persuasive when balanced against what is viewed to be an overriding consideration.

A type of contract whose ultimate purpose is specification manufacturing for a purchaser under which title is to pass before delivery, but after partial payment, appears to this Court to be a far cry from any customary lien or security situation. There is no contention here that the United States is at any time to retransfer title to the manufactured product(s) back to the plaintiff once the plaintiff has performed the necessary conditions. There is no mere lien here which the United States might foreclose. Might it be legally said that if the plaintiff failed to complete the manufacturing that the United States could not take possession of the property in question and assign it to another manufacturer for completion?

It was intended by the parties that plaintiff was to manufacture certain sub-assemblies according to specification which would become the property of the purchaser, United States. The fact of future delivery is not determinative of ownership. The fact of contractual agreement is—such agreement stipulating the time for passage of title. Why should plain, unambiguous language be distorted so as to convert a legal title-holder to a lienor because persons not party to the contract contend that title passed prematurely? If a lien situation is to be construed, it could only be in favor of the plaintiff as to labor and materials not paid for (without considering for the moment the legality of a lien on Government property.)

In summing up, it appears that the position of the defendants here, in order to be maintained, requires a forced construction of the contracts involved, whereas a natural construction does violence to no legal or equitable concepts. It is therefore concluded that summary judgment should be entered for the plaintiff, and an order may be presented accordingly.